ETTA M. SHERMAN *vs.* RHODE ISLAND HOSPITAL TRUST COMPANY, *Admr. c.t.a. et al.*

FEBRUARY 3, 1943.

PRESENT: Flynn,·C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J.   This is a bill in equity to remove a cloud upon the complainant's record title to certain real estate, allegedly arising by virtue of an attachment and a levy of execution thereon, and also to enjoin the respondents from selling upon such execution any interest in said realty. The

answer of the respondent bank, in the nature of a cross bill, alleged that it was a judgment creditor of the complainant's husband; that his conveyance to complainant of the realty in question, being made with intent to hinder, delay and defraud a creditor, was fraudulent and void; and that he was the owner of an undivided one half of the realty upon which the attachment had been made and execution had been levied. It also prayed that the complainant's own one-half interest in the realty be subjected to an equitable lien to the extent that improvements to buildings, as well as the payment of a certain note and mortgage upon the realty, were made with moneys wrongfully obtained by complainant's husband from his mother.

The cause was heard in the superior court upon bill, answer, replication and evidence, whereupon a decision was rendered denying and dismissing the bill of complaint and granting in part and denying in part the prayer of the respondent bank for an equitable lien. A decree accordingly was entered and the cause is here upon appeals by both parties from that decree.

The complainant is the wife of Arthur A. Sherman who, unless otherwise described, will be referred to as Arthur. The Rhode Island Hospital Trust Company is the administrator c.t.a. of the estate of Ella F. Sherman, deceased, mother of Arthur, and it will hereinafter be called the respondent. The other respondents are certain sheriffs who were named only because of their connection with the service of process or the proposed execution sale.

The following are some of the material facts in evidence. The complainant and her husband in 1917 had taken title as tenants in common to an improved farm in the town of Scituate and thereafter had been in continuous possession thereof. On January 26, 1924 Adin R. Sherman, father of complainant's husband, died leaving a will whereby he devised and bequeathed to Ella F. Sherman, his widow, all the residue of his real and personal property, which included substantially the homestead farm and woodlots in the town

of Glocester and certain moneys amounting to more than $17,000, deposited in savings banks in Rhode Island and Connecticut. The widow was named and appointed executrix of that will and shortly thereafter went to live with her son Arthur and his wife on their farm in Scituate.

Between April and October 1924 Arthur obtained from his mother certain bankbooks and orders upon which he received, from the deposits bequeathed to her by her husband, moneys totaling $17,431.55. This money was placed by Arthur in or transferred to bank accounts or safe deposit boxes in the name of himself, or of himself and complainant, and in part was mingled with his own money and kept in various places in his house. Certain expenditures were made by him therefrom to pay a $1600 note made by Arthur and complainant, thereby discharging a corresponding mortgage that covered all their Scituate farm, and to make certain repairs or improvements to the house, restaurant and gas station on these premises. These expenditures are the bases for the respondent's claim of an equitable lien upon complainant's own interest in this realty.

In August 1925 a conservator was appointed for Arthur's mother and in October of that year he demanded from Arthur the return of all the moneys, books and papers, *etc.*, which were obtained from and belonged to her. Arthur refused to comply with this demand and told the conservator to "go and find them". In May 1926 the mother was removed as executrix of her husband's will and the respondent was appointed administrator *d.b.n.c.t.a.* Shortly thereafter Arthur was summoned before the probate court by the conservator for examination concerning his possession of the bankbooks, money and other property which he had obtained from his mother. Upon the latter's death in February 1927, the respondent was appointed administrator *c.t.a.* of her estate; but an appeal from the probate of her will was filed by Arthur's sister and other interested parties and was pending when the conveyance in question was made on March 22, 1929. Meanwhile the respondent, as administra-

tor, had been demanding payment by Arthur of the claim for the moneys that he had wrongfully obtained from his mother. Negotiations for settlement of this claim had been going on with Arthur, through his attorney, and respondent just prior to March 1929 had threatened suit unless the claim was settled.

With notice of respondent's demands, Arthur shortly thereafter withdrew the last two known bank deposits standing in his name, totaling over $3000, and four days later, on March 22, 1929, he conveyed to the complainant, without consideration, his undivided one-half interest in the Scituate realty in question. Arthur then refused to go through with the settlement of respondent's claim and demand, as recommended by his own attorney, and in 1930 the respondent commenced two actions at law to recover the moneys bequeathed to the mother by her husband's will and wrongfully obtained by Arthur from her.

The action brought on behalf of the estate of his father was decided in favor of Arthur. *Rhode Island Hospital Trust Co.* v. *Sherman,* 52 R. I. 207; *Same* v. *Same,* 53 R. I. 215. The action on behalf of his mother's estate resulted in a verdict against Arthur in the sum of $26,296.73, that being the original amount obtained, $17,431.55, plus interest. This verdict also included a special finding by the jury that Arthur did ". . . with intent to defraud her, demand and receive from her orders for the payment of sums of money deposited in banks . . . ."

While that case was pending on Arthur's exceptions, the respondent had attached by mesne process all his interest in the realty in question; and in June 1936 the above-mentioned verdict against him was affirmed by this court. *Rhode Island Hospital Trust Co.* v. *Sherman,* 56 R. I. 355. Accordingly a judgment was entered in favor of the respondent, execution was levied upon Arthur's interest in the realty in question and a sale thereof upon such execution was being advertised. The complainant, who was not a party to the other litigation against her husband, then brought this bill,

alleging that she had obtained title to Arthur's undivided one half of the realty by his deed dated March 22, 1929 for good and valuable consideration. The uncontradicted evidence, however, showed that the conveyance was voluntary and without any consideration.

The questions presented to the trial court were: (1) Whether that conveyance by Arthur A. Sherman came within the meaning of a fraudulent conveyance under G. L. 1938, chap. 482, § 1, which at the time of the conveyance appeared as G. L. 1923, chap. 297, section 1; (2) whether payments by him with moneys obtained from his mother, to discharge a mortgage of $1600 outstanding upon all the realty and to make certain repairs or improvements to buildings thereon, created an equitable lien in favor of the respondent upon the complainant's own undivided one-half interest therein; and (3) whether such interest of complainant may be subjected to an equitable lien, including interest upon the money computed from the date of the expenditure.

The trial justice found, in substance, that Arthur A. Sherman was insolvent on March 22, 1929 when he conveyed without consideration his one-half interest in the Scituate farm to the complainant; that such conveyance was made with intent in fact to hinder, delay and defraud the respondent creditor; and that the inevitable effect of such conveyance, in the circumstances existing at the time, was to hinder, delay and defraud the respondent creditor from collecting a just claim, thereby making such conveyance fraudulent and void under the provisions of chap. 482, § 1.

On these findings the trial justice denied and dismissed the bill of complaint. He also granted the prayers of the answer in the nature of a cross bill, setting aside the transfer and conveyance by Arthur A. Sherman to the complainant dated March 22, 1929, and establishing an equitable lien upon the complainant's own interest in the realty to the extent of one half the total amount used by Arthur to pay the note and to discharge the $1600 mortgage, with interest; and he denied the prayer for an equitable lien as to the

money expended for repairs or improvements to the buildings on the farm.

By her reasons of appeal complainant alleges, in substance, that the trial justice misconceived both the law and the evidence in deciding that Arthur's conveyance to the complainant of the realty in question was fraudulent under chap. 482, § 1. We cannot agree that the trial justice misconceived the law. An examination of the decision and transcript shows clearly that he had in mind the principles of law set forth in several cases decided under this statute, to which he expressly referred. *Tanner* v. *Whitney,* 52 R. I. 391; *Savoie* v. *Pion,* 52 R. I. 422; *Carroll* v. *Salisbury,* 28 R. 1. 16. Such examination also fails to support complainant's contention that the trial justice, contrary to *De Wolf* v. *Martin,* 12 R. I. 533, had adopted a rule that the mere conveyance without consideration by Arthur to his wife was enough, without more, to constitute it as fraudulent. It is also clear that the trial justice's necessary findings were not based solely upon evidence of Arthur's conduct after the conveyance or upon a subsequent claim or creditor, as complainant contends. On the contrary, he based such findings on evidence that was related expressly to the time of the conveyance and to a just claim by an existing creditor, in accordance with *Harriss* v. *Orr,* 65 R. I. 369. In our opinion, the trial justice did not misconceieve the law applicable to the facts in evidence.

The complainant next contends that the trial justice misconceived the evidence in making his ultimate findings of fact. She concedes that Arthur's conveyance to the complainant on March 22, 1929 would be fraudulent under chap. 482, § 1, if Arthur was insolvent at that time or if such conveyance was made by him with the intent to hinder, delay and defraud an existing creditor. But she contends that, apart from the mere conveyance without consideration, there was no evidence to support either of these findings. We cannot agree with these contentions.

It seems reasonably clear that the trial justice found that

Arthur did not have property enough in March 1929—exclusive of the realty conveyed—to pay the respondent's claim, unless he also had in his possession at that time the major portion of the money he had wrongfully obtained from his mother. In this connection, following Arthur's testimony that he did not then consider that he owned his father's homestead farm—evidently because the wills of his father and mother were still in process of probate administration or litigation—the transcript shows: "Q. What property did you own the first day of March, 1929? A. Before I deeded this to my wife? Q. Yes. A. Owned half the farm. Q. What else? A. Live stock. . . . Q. What else? A. That is about all I had." Elsewhere he disclosed that, at that time, outside of the live stock, that is, five or six cows, he "had a mowing machine, horse rake, header, plow, cultivators", that he owned no securities, stocks or bonds, or any money or property in another's name or custody, and that no loans or mortgages were due to him.

Moreover, whatever the real fact may have been, Arthur also testified: "Q. Can you give us any information at all as to where any money was that you had left that you got from your mother, where it was on March 1st, 1929? A. March 1st? That I couldn't tell you. I can't tell these dates. I have no records. Q. That was just before you conveyed this property to your wife. A. I had that $4,800 in the Union Trust Company. Q. And any other money? That was under attachment, wasn't it? A. Not then, no. Q. Anything else? A. No, I don't think so." Again when confronted with testimony that he had given in a previous proceeding concerning the disposition of this money, he did not deny having testified to disclosures he had made in 1926 to the probate court as follows: ". . . 'What finally became of the money which you withdrew from the Providence banks? Answer,—I spent it for various things.' Do you remember it? A. I don't remember what I testified to. Q. You did spend it for various things? A. Yes, sir, I did."

The complainant herself gave no probative testimony on

this issue but relied entirely upon Arthur who testified in her behalf. Considering his above-quoted testimony it cannot be said, as complainant contends, that there was no evidence to support the trial justice's finding upon the issue of Arthur's insolvency. Moreover, from our examination of all the evidence we cannot say that the trial justice was clearly wrong in finding, upon conflicting evidence, that Arthur was insolvent at the time of the conveyance.

If, notwithstanding such testimony by Arthur, the complainant may argue that he must have had a large portion of his mother's money, since elsewhere in the evidence he specifically accounted for expenditures totaling about half thereof, such contention seems to lead to the alternative finding of the trial justice, namely, that Arthur intended by this voluntary conveyance to his wife to hinder, delay and defraud the respondent creditor. His own testimony shows that only four days before such conveyance he had withdrawn the entire deposits in two different banks, totaling over $3000, leaving no other known bank accounts, involving his mother's money, that stood in his own name; that at that time he had knowledge of the respondent's claim and demands and at least notice of its threatened suit; and that, apart from $4800 which he testified he had placed in a 'safe deposit box in the name of his wife and himself, all the remainder of his mother's money had been withdrawn from banks and was kept in his home, "some under the sink", "some down cellar", and "some in my pocket." The reason for such action appears in Arthur's own testimony as follows: "Q. You didn't intend anybody should find it? A. Well, I didn't really want them to know."

The trial justice found it clear from such testimony, when considered with the evidence of Arthur's deliberate course of conduct between 1924 and 1929, that he intended to remove all this money and secrete it where it would not be known or reachable by this respondent for payment of its existing claim and demand. The trial justice then reasoned that if Arthur intended, in March 1929, to thus hinder, delay

and defraud the respondent from collecting its just claim out of any of this money, as he found, a similar intent could be reasonably inferred in connection with his conveyance of this realty to his wife, without consideration, within four days of the withdrawal and secretion of moneys above mentioned. Hence he found in effect that at the time Arthur had the same knowledge of respondent's claim and demands and had notice of its threatened suit if settlement were not forthcoming in March 1929; and that he also would have the same, if not a stronger, desire to protect the property that belonged to his wife and himself from being subjected to process for collection of respondent's claim.

Considering all the facts and circumstances existing in March 1929, as they appear in the transcript, and keeping in mind that complainant was a donee and not a purchaser for valuable consideration, we cannot say that the trial justice was clearly wrong in finding that Arthur's conveyance to complainant on March 22, 1929 was intended in fact to hinder, delay and defraud the respondent creditor and was within the contemplation of chap. 482, § 1.

The complainant also argues that it was error to subject her one-half interest in this realty to an equitable lien in favor of the respondent, because the trial justice found that she had no knowledge of the wrongful acquisition and conversion by Arthur of moneys belonging to his mother. This contention misconceives the theory upon which the equitable lien was prayed for and was granted. The allowance of such a lien, to the extent of one half the amount paid by her husband out of his mother's money to pay the note and discharge a $1,600 mortgage that covered the whole realty, was made upon the principle of unjust enrichment. Regardless of her lack of knowledge of her husband's wrongful acquisition of the money which had been used to pay the note and discharge the mortgage, her own interest undeniably had benefited from the use of that money to the extent set forth in the decree. No part thereof was contributed by

her. We find no error in the trial justice's finding or decree in this regard.

Complainant also contends that such a lien, if granted, should not include interest from the date of payment of the mortgage. This presents a closer question in view of the finding that she lacked knowledge of the alleged fraud. However, since the complainant was obligated to pay the whole amount of the mortgage note and interest, from which obligation she was relieved by the payment of the mortgage debt from the money belonging to her husband's mother, it does not seem inequitable to allow interest on *one half* of the amount so paid, computed from the date of such payment.

Other questions stated in the reasons of appeal have not been briefed or argued by complainant and they are deemed to be waived. Therefore, the appeal of the complainant is denied.

The respondent has claimed an appeal from the decree alleging that the trial justice erred in refusing to grant an equitable lien against the complainant's one-half interest to the extent of expenditures by her husband out of his mother's money for repairs and improvements to the house, the restaurant and the gas station located on the farm. Upon examination of the transcript we cannot say that there was competent evidence of enhanced value to the realty which required the granting of a lien in this respect, as prayed for by the respondent. The respondent's appeal, therefore, is denied.

Both appeals are denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Henry M. Boss, J. Whitney MacDonald,* for complainant.

*Tillinghast, Collins & Tanner, Harold E. Staples,* for respondent.